IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re Testosterone Replacement Therapy Products Liability Litigation | ) ) ) ) ) ) ) | Case No. 14 C 1748<br>MDL No. 2545 |
| (This document applies to *Bunting v. AbbVie Inc.*, Case No. 15 C 9699) | | |

CASE MANAGEMENT ORDER NO. 192
(Order on AbbVie's motion for summary judgment
in *Bunting v. AbbVie Inc.*, No. 15 C 9699)

MATTHEW F. KENNELLY, District Judge:

Plaintiffs in this multidistrict litigation (MDL) proceeding allege that they suffered either arterial cardiovascular injuries or injuries related to blood clots in the veins (venous thromboembolisms) as a result of taking prescription testosterone replacement therapy (TRT) drugs. Defendants AbbVie Inc., AbbVie Products LLC, Abbott Laboratories, Inc., and Unimed Pharmaceuticals, Inc (collectively, AbbVie) manufacture AndroGel, one of the TRT products at issue in this litigation. Juliana Bunting, who is suing in the dual capacity of personal representative of the estate of her late husband, Kenneth Bunting and on her own behalf, alleges that Kenneth Bunting's use of AndroGel in 2013 and 2014 caused his death from a heart attack in April 2014.[1] The plaintiffs assert wrongful death and survival claims of strict liability, negligence, negligent misrepresentation, breach of warranty, and redhibition, as well as other claims.

---

[1] Where necessary to avoid confusion, the Court will refer to Juliana Bunting and Kenneth Bunting by their first names and the estate of Kenneth Bunting as "the Estate."

AbbVie has moved for summary judgment on all of the plaintiffs' claims. For the following reasons, the Court denies AbbVie's motion for summary judgment on Juliana's wrongful death claim as it relates to the strict liability failure to warn, negligent failure to warn, strict liability design defect, fraud, negligent representation, and consumer protection claims. The Court otherwise grants the motion for summary judgment.

## Background

The Court assumes familiarity with the background as set out in its prior case management orders and therefore discusses only those details uniquely relevant to the plaintiffs' claims. The Court recounts the following facts from the parties' Local Rule 56.1 statements, exhibits, and summary judgment briefing. The facts are undisputed except where otherwise stated.

### A.     Kenneth's medical history

Kenneth suffered from diffuse coronary artery disease, diabetes, hypertension, high cholesterol, and obstructive sleep apnea. He began using prescription testosterone injections in 1999 and first met with Dr. Karl Kochendorfer on December 23, 2010. During that visit, Kenneth asked Dr. Kochendorfer about continuing his injectable TRT prescription. Dr. Kochendorfer testified during his deposition that he believes he discussed the cardiovascular risks of TRT with Kenneth in 2010, stating:

> In my first note at the very bottom of the note in the assessment and plan, I documented that we discussed [Kenneth]'s testosterone, taking of that. I counseled [Kenneth] on it. Typically for me and what I recall from med school and others that there may be an increased [cardiovascular] risk, and I tried to counsel him about that potential, even during that first visit, that was—I made one line in the note about the discussion of testosterone replacement.
>
> I believe that I shared with [Kenneth] there might be cardiovascular risk while taking testosterone or the potential of it.

2

> I believe I did discuss possible cardiovascular risk with [Kenneth] at [the December 23, 2010] visit.

Pls.' LR 56.1 Stat., Ex. A, Kochendorfer Dep. Tr. ("Kochendorfer Dep."), at 22:8–16, 23:1–3, 98:2–3 (dkt. no. 53-2).

Dr. Kochendorfer continued Kenneth's injectable TRT prescription until May 2012, when Kenneth switched to a testosterone patch called Androderm. After using Androderm for several months and seeing a commercial for AndroGel, Kenneth emailed Dr. Kochendorfer in November 2012 to ask about switching to AndroGel.

Kenneth and Dr. Kochendorfer discussed switching to AndroGel during their December 2, 2012 appointment. Dr. Kochendorfer stated that he "[felt] like [his] discussion about risks happened in [the December 2010] visit" and that he did not recall discussing the specific risks of AndroGel with Kenneth during the December 2012 appointment. Kochendorfer Dep. at 66:24–67:4.

When asked if he had prescribed AndroGel for Kenneth, Dr. Kochendorfer answered that he did not see an order for AndroGel in his note of the appointment, which usually includes any orders he places. He also testified that he does not prescribe AndroGel very often and that he did not know if he had ever initiated an AndroGel prescription himself. Kenneth's prescription records, however, indicate that Kenneth filled a prescription for AndroGel in January and May 2013 that listed Dr. Kochendorfer as the prescriber. After reviewing those records, Dr. Kochendorfer stated that it appeared he had written an AndroGel prescription for Kenneth.

Dr. Kochendorfer moved to a different medical practice in December 2012 and had no communications with Kenneth after their December 2, 2012 appointment. He

3

transferred Kenneth's care to Dr. Aaron Gray, who met with Kenneth for the first time on March 18, 2013. Dr. Gray's records from that appointment note that Kenneth had low testosterone and had used "Androderm in [the] past but switched to cheaper AndroGel." Pls.' LR 56.1 Stat., Ex. E at 1 (dkt. no. 53-6). Dr. Gray treated Kenneth and continued his AndroGel prescription until April 2014, when Kenneth died after suffering a heart attack.

**B.     Dr. Kochendorfer's knowledge**

During his deposition, Dr. Kochendorfer also testified about his own knowledge of the risks of TRT when he discussed the treatment with Kenneth in December 2010. He stated:

> I believe I was under the impression that testosterone replacement might increase myocardial or cardiovascular events or risks. I believe that was something that I might have been taught either in med school or by other teachers in residency or picked up in some other way in grand rounds or lectures or—or other means, and so I do believe it was a consideration of mine in that first visit.

Kochendorfer Dep. at 94:8–15. He testified that he did not know "specifically where [he] would have learned that information" and that "[i]n addition to other educational forums [and] training," he relied on a software application named Epocrates as "a quick easy reference" in clinical care regarding the risks and benefits of the treatments he prescribes. *Id.* at 94:17–19, 95:22–96:3. He stated that he did not recall reading AndroGel's medication label itself or seeing any advertising for AndroGel.

Additionally, Dr. Kochendorfer testified that even if information about the risks of TRT may not have been on Epocrates when he met with Kenneth, he did "feel like [he] was taught or was aware of potential cardiovascular risk." *Id.* at 96:22–24. Later in the deposition, he explained that the source of his knowledge of the risks of TRT in 2011

4

and 2012 would have been either "[his] training or taking into account [that] increased levels of lipids or hemoglobin or hematocrit, you know, might be a predisposition to a cardiovascular event." *Id.* at 98:23–99:2.

In contrast, Dr. Kochendorfer stated that he did not recall a 2015 memorandum from the Food and Drug Administration (FDA) indicating that "the agency had become aware that manufacturers were promoting [TRT] off-label for men who had low-testosterone due to aging or other conditions." *Id.* at 102:2–5. Nor did he know that in 2018 the FDA informed AbbVie and other manufacturers that it "had become aware of clinically meaningful increases of blood pressure associated with taking testosterone." *Id.* at 106:9–11. He testified that if TRT was "not indicated for low testosterone due to diabetes or . . . aging or . . . obesity" or "testosterone could actually be associated with causing [] higher blood pressures," then being aware of that information might have helped his decision-making process. *Id.* at 102:19–21, 107:18–19.

Dr. Kochendorfer also stated that he had not looked at any materials related to AndroGel to prepare for his deposition other than the information about the drug on Epocrates. At the time of Dr. Kochendorfer's deposition in September 2021, Epocrates indicated that serious reactions to AndroGel included the risk of a heart attack. When asked about his knowledge of the cardiovascular risks of AndroGel in September 2021 and if it was "possible that [he was] actually thinking about all of the information that's now known and thinking that maybe [he] had access to it . . . in 2011 and 2012," Dr. Kochendorfer responded that it was "very possible." *Id.* at 95:14–20.

## Discussion

A party is entitled to summary judgment if it shows that there is no genuine issue

5

of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). There is a genuine issue of material fact, and summary judgment is precluded, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, a court examines the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* at 255; *see also Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017).

**A.     The Estate's claims**

The parties agree that Missouri law governs the plaintiffs' claims. Under Missouri law, "[a]n action for personal injuries that result in death may only be brought under [Section 537.080, the wrongful death] statute, while actions 'other than those resulting in death' may be brought under [Section 537.020, the 'survivorship' statute]." *Mickels v. Danrad*, 486 S.W.3d 327, 329 (Mo. 2016) (en banc); *see also Wollen v. DePaul Health Ctr.*, 828 S.W.2d 681, 685 (Mo. 1992) (en banc) ("The language of the survivorship statute and the wrongful death statute are mutually antagonistic").[2] Because the plaintiffs contend that AbbVie's failure to warn of the alleged cardiovascular risks of AndroGel caused Kenneth's death, only Juliana's wrongful death claim is viable. *See* Mo. Rev. Stat. § 537.080.1(1)–(3) (limiting parties who may sue for wrongful death to spouses, children, next of kin, and "plaintiffs ad litem" appointed by the court). The Court therefore grants summary judgment on the Estate's claims.

---

[2] The Supreme Court of Missouri noted that "[s]ection 537.020 is referred to as the 'survivorship statute' because causes of action other than those resulting in death are said to 'survive' the plaintiff's demise and may be brought by the plaintiff's personal representative." *Mickels*, 486 S.W.3d at 329 n.2.

6

B.  **Juliana's wrongful death claim**

"Under Missouri's wrongful death statute, a decedent's spouse or children may sue for damages[] '[w]henever the death of a person results from any act, conduct, occurrence, transaction, or circumstance which, if death had not ensued, would have entitled such person to recover damages in respect thereof.'" *Thompson v. R.J. Reynolds Tobacco Co.*, 760 F.3d 913, 915–16 (8th Cir. 2014) (quoting Mo. Rev. Stat. § 537.080.1). Because "the right to sue for wrongful death is conditioned on the fact that the decedent could have maintained an action for damages for the injuries sustained had he or she survived," plaintiffs in wrongful death actions are "required to show the requisite elements of" their underlying tort claim. *Super v. White*, 18 S.W.3d 511, 515 (Mo. Ct. App. 2000). Similarly, defendants "may assert 'any defense which the defendant would have had against the deceased in an action based upon the same act, conduct, occurrence, transaction, or circumstance which caused the death of the deceased, and which action for damages the deceased would have been entitled to bring had death not ensued.'" *Thompson*, 760 F.3d at 916 (quoting Mo. Rev. Stat. § 537.085).

The Court denies AbbVie's motion for summary judgment on the wrongful death claim because a reasonable jury could find that Juliana has shown the requisite elements of a failure to warn claim—though arguably just barely.[3] Juliana does not

---

[3] Juliana indicated on her short-form complaint that she brought claims for strict liability failure to warn and negligence. She does not specify the basis for her negligence claim in her response, so the Court will assume that Juliana's negligence claim is based on AbbVie's failure to warn. *See In re Testosterone Replacement Therapy Prod. Liab. Litig.*, No. 14 C 1748, 2017 WL 1836435, at *20 (N.D. Ill. May 8, 2017) (granting summary judgment on negligent design defect claims in the bellwether plaintiffs' cases).

7

address AbbVie's arguments about her other underlying claims, instead contending that they "are tied to its failure-to-warn argument and should fail for the same reason." Pls.' Opp. to Summ. J. at 20. Although AbbVie's motion for summary judgment on the underlying strict product design defect claim fails for lack of legal support, Juliana has forfeited the argument on the other underlying claims. *See Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 528 (7th Cir. 2005) (because the plaintiff "failed to properly present the issue . . . in response to [the] motion for summary judgment, that issue is waived."); *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived").[4] [5]

### 1. Failure to warn

For both strict liability and negligent failure to warn claims, a plaintiff must show, among other things, that the allegedly inadequate warning proximately caused his injury. *Moore v. Ford Motor Co.*, 332 S.W.3d 749, 762, 764 (Mo. 2011) (en banc). "Missouri courts adhere to the learned intermediary doctrine," meaning that a drug manufacturer's duty to warn runs to the prescribing physician rather than the patient. *Doe v. Alpha Therapeutic Corp.*, 3 S.W.3d 404, 419 (Mo. Ct. App. 1999) (citing *Krug v. Sterling Drug, Inc.*, 416 S.W.2d 143, 146 (Mo. 1967)). Under the learned intermediary doctrine, therefore, "the failure of a drug manufacturer to provide the physician with an

---

[4] Juliana indicated on her short-form complaint that she sought punitive damages, but neither party addressed the issue in the summary judgment briefing. The Court therefore declines to decide it.

[5] Juliana also brought a loss of consortium claim, but it is duplicative of her wrongful death claim because a "spouse's claim for wrongful death specifically includes damages for loss of consortium." *Kivland v. Columbia Orthopaedic Grp., LLP*, 331 S.W.2d 299, 303 n.4 (Mo. 2011).

adequate warning of the risks associated with a prescription product is 'not the proximate cause of a patient's injury if the prescribing physician had independent knowledge of the risk that the adequate warnings should have communicated.'" *Doe*, 3 S.W.3d at 420 (quoting *Christopher v. Cutter Labs.*, 53 F.3d 1184, 1192 (11th Cir. 1995); *see also Kirsch v. Picker Int'l, Inc.*, 753 F.2d 670, 671 (8th Cir. 1985) (applying Missouri law) (a defendant's "failure to warn [the prescribing physician] could not have been the proximate cause of [the plaintiff]'s injury if [the physician] was already aware of the [risk]"). A prescribing physician is sufficiently aware of the risk if he "had substantially the same knowledge as an adequate warning from the manufacturer that should have been communicated to him." *Doe*, 3 S.W.3d at 420.

Similarly, "if [the plaintiff] was aware of the danger and had all the sufficient and timely notice of the same that a warning signal could have afforded him, then the defendant's failure to have given a warning could not be deem[ed] to have been the proximate cause of the ensuing injury." *Gottman v. Norris Const. Co.*, 515 S.W.2d 861, 864 (Mo. App. Ct. 1974) (quoting *Feeherty v. Sullivan*, 129 S.W.2d 926, 928 (Mo. App. Ct. 1939) (internal quotation marks omitted); *see also Shine v. Sw. Bell Tel. Co.*, 737 S.W.2d 203, 205 (Mo. App. Ct. 1987) ("It is not actionable negligence to fail to give a warning of the existence of a condition to one who has actual knowledge thereof as the law will not require the performance of a useless act."). Therefore, AbbVie would be entitled to summary judgment if no reasonable jury could find that Kenneth himself was unaware of the cardiovascular risks of AndroGel.

The parties dispute whether a reasonable jury could find that (1) Dr. Kochendorfer was the physician who prescribed AndroGel to Kenneth, (2) the physician

who prescribed AndroGel was aware of its cardiovascular risks, and (3) that prescribing physician informed Kenneth of those risks. The Court will address each issue in turn.

### a.     Prescribing physician

Juliana contends that there is a genuine dispute of material fact regarding which doctor prescribed AndroGel to Kenneth. The record does not support this contention. Before his death, Kenneth saw two physicians for testosterone treatment: Dr. Kochendorfer from December 2010 to December 2012 and Dr. Gray from March 2013 on. The parties do not dispute that Kenneth asked Dr. Kochendorfer about AndroGel during their December 2012 appointment, but Juliana contends that Dr. Kochendorfer did not prescribe the drug at that time. She relies on Dr. Kochendorfer's testimony that (1) he did not see an AndroGel prescription in his notes, which usually include the prescriptions he writes, (2) he does not prescribe AndroGel often, and (3) he did not know if he had ever initiated a prescription for it himself. Yet Dr. Kochendorfer never expressly testified that he did not prescribe AndroGel to Kenneth, and pharmacy records show that Kenneth filled a prescription for AndroGel in January and May 2013 that listed Dr. Kochendorfer as the prescriber. When shown those records, Dr. Kochendorfer admitted that it appears that he wrote Kenneth a prescription for AndroGel.

Although the Court must draw all reasonable inferences in Juliana's favor at this stage, the timing of Kenneth's AndroGel prescription precludes any inference that Dr. Gray could have been the prescribing physician. Kenneth filled his first AndroGel prescription in January 2013—after he met with Dr. Kochendorfer in December 2012 and before his first meeting with Dr. Gray in March 2013. Juliana does not dispute this

sequence of events but instead argues that it is more likely that Dr. Gray "called in" a prescription for AndroGel in January 2013 before ever meeting with Kenneth. But she provides no evidence to support this conclusion or even suggest that this is a common practice. And Dr. Gray's notes from that first meeting state that Kenneth had switched to AndroGel from another TRT treatment.[6] Because the Court's "favor toward the nonmoving party does not extend to drawing '[i]nferences that are supported by only speculation or conjecture,'" there is no basis for a reasonable jury to infer that Dr. Gray called the pharmacy in January 2013 to prescribe a new drug under another doctor's name for a patient he had never seen. *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010) (quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008))

      **b.**     **Prescribing physician's knowledge**

AbbVie's motion for summary judgment therefore depends on whether Dr. Kochendorfer was aware that TRT treatments like AndroGel allegedly posed an increased risk of cardiovascular injury. The parties' arguments on this question rely largely on Dr. Kochendorfer's deposition testimony. Because a reasonable jury could interpret that testimony to show that Dr. Kochendorfer was uncertain about what he knew and when he knew it, the Court denies the motion.

AbbVie cites to testimony by Dr. Kochendorfer suggesting that he knew of the risks of TRT, but even taking those statements at face value, Dr. Kochendorfer was less

---

[6] Juliana appears to contend that the statement "Androderm in past but switched to cheaper AndroGel" in Dr. Gray's notes indicates that Dr. Gray was the physician who switched Kenneth to AndroGel. Pls.' Opp. to Summ. J. at 20 (citing Pls.' LR 56.1 Stat., Ex. E at 1 (dkt. no. 53-6)). Although that statement, in a vacuum, could be read to suggest Dr. Gray switched Kenneth to AndroGel at that March meeting, we are not operating in a vacuum: this doesn't take into account how Dr. Gray possibly could have helped Kenneth fill his first AndroGel prescription before the two men ever met.

than certain about the extent of his knowledge in 2012. Dr. Kochendorfer repeatedly prefaced the statements AbbVie relies on with "I believe" or other indications of uncertainty, stating "*I believe* I was under the impression that [TRT] might increase [cardiovascular risks]," "*I believe* [the risk] was something that I might have been taught either in med school or by other teachers or picked up in some other way," and "*I do feel like* I was taught or was aware of potential cardiovascular risk." Kochendorfer Dep. at 94:8–13, 96:22-24 (emphasis added). This uncertainty is notable because Dr. Kochendorfer also appeared to concede that it was "very possible" that he might have been conflating—or possibly substituting—the knowledge he had in 2021 of the risks of TRT with his knowledge in 2010 when he discussed those risks with Kenneth.[7] *Id.* at 95:9–18. Although a jury could still conclude otherwise and find in favor of AbbVie at trial, it would not be unreasonable for a jury to find based on the totality of these statements that Dr. Kochendorfer could not say what—if anything—he knew about the risks of TRT at the time he prescribed AndroGel to Kenneth.

Furthermore, there is a genuine factual dispute regarding whether Dr. Kochendorfer had substantially the same knowledge as an adequate warning from AbbVie would have provided. When asked about the source of his knowledge concerning the cardiovascular risks of TRT, Dr. Kochendorfer stated that it was "[e]ither [his] own training or taking into account [that] increased levels of lipids or hemoglobin or hematocrit, you know, might be a predisposition to a cardiovascular event."

---

[7] Contrary to AbbVie's assertion, plaintiffs' counsel's deposition question—though long—was not objectionable from an evidentiary standpoint. The Court therefore considers Dr. Kochendorfer's answer in determining whether there is a genuine factual dispute that would allow a reasonable jury to find in favor of Juliana.

Kochendorfer Dep. at 98:23–99:2. AbbVie is correct that Dr. Kochendorfer monitored Kenneth's other vitals, but it points to no evidence explaining what Dr. Kochendorfer meant by "cardiovascular risk." Rather, it asks the Court to infer that Dr. Kochendorfer believed "cardiovascular risk" to refer to more than increased levels of lipids, hemoglobin, or hematocrit. But at this stage the Court must draw all reasonable inferences in favor of Juliana, the non-moving party. For this reason, the Court reads Dr. Kochendorfer's testimony regarding his knowledge of the cardiovascular risk as limited to increased levels of lipids, hemoglobin, and hematocrit, the points he specifically mentioned—which would not map directly onto the full scope of the risk claimed to be posed by TRT that is the subject of the alleged warning deficiencies. *See In re Testosterone Replacement Therapy Prod. Liab. Litig.*, No. 14 C 1748, MDL No. 2545, 2017 WL 1836435, at *13–14 (N.D Ill. May 8, 2017) (the risks of TRT include that it was "known to increase hematocrit" and it "can increase the risk of cardiovascular injury, including through an effect on (1) thromboxane A2; (2) estradiol levels; (c) erythropoiesis; and (d) nitric oxide.").

      A reasonable jury could also find that at the time Dr. Kochendorfer treated Kenneth, the available information about AndroGel—and thus the information he would have had—did not reflect the full extent of the drug's risks. Dr. Kochendorfer testified that he did not know about a 2015 "safety memo" from the FDA that "admonish[ed] manufacturers for promoting off-label for age-related hypogonadism." AbbVie's Resp. to Pls.' LR 56.1 Stat. at 10, ¶ 22 (dkt. no. 55-1).[8] Dr. Kochendorfer also agreed that it

---

[8] AbbVie argues that the plaintiffs' characterization of the FDA's memorandum "lacks basis in testimony," but it provides no evidence—testimonial, documentary, or otherwise—establishing that the characterization is inaccurate. At best, AbbVie's

13

might have helped his decision-making process to know if AndroGel was not indicated for treating low testosterone due to diabetes, aging, or obesity. Although the FDA issued this memo in 2015, years after Dr. Kochendorfer and Kenneth discussed the risks of TRT in 2010 or switching to AndroGel in 2012, a reasonable jury could find that AbbVie would have known that its product had not been indicated for treating low testosterone caused by those health conditions. A reasonable jury could further find that AbbVie nevertheless promoted AndroGel off-label while declining to inform physicians or patients about the treatment's lack of indication by the FDA, an omission especially relevant here because Kenneth suffered from diabetes and was overweight and sixty-four years old when he asked to switch to AndroGel. Consequently, it would be reasonable for a jury to conclude that Dr. Kochendorfer would not have prescribed AndroGel for Kenneth had he been fully apprised of the fact that it was not indicated for individuals with Kenneth's conditions. *In re Testosterone Replacement Therapy*, 2017 WL 1836435 at *13–14 (denying summary judgment where physician's assistant accounted for the risk of blood clots but not DVT in prescribing AndroGel and did not know if being aware of the risk of DVT would have changed his decision).

      For these reasons, the Court concludes that a reasonable jury could find that Dr. Kochendorfer did not have "substantially the same knowledge as an adequate warning from the manufacturer that should have been communicated to him." *Doe*, 3 S.W.3d at 420. The Court therefore denies AbbVie's motion for summary judgment on Juliana's wrongful death claim as it relates to the learned intermediary defense and Dr.

---

contention that the memorandum is mischaracterized shows the existence of a genuine factual dispute on this point.

Kochendorfer's knowledge of the risks of TRT.

### c. Kenneth's knowledge

In addition, AbbVie contends that Kenneth's own knowledge of the risks of TRT constitute an independent basis for granting summary judgment on the failure to warn claim. Yet it argues only that Dr. Kochendorfer informed Kenneth of the cardiovascular risk, and neither party contends that Kenneth could have learned about the risk from any other source. Because there is a genuine factual dispute regarding Dr. Kochendorfer's knowledge of TRT's risks and Kenneth could only have learned about the risks through Dr. Kochendorfer, it follows that there is a genuine factual dispute about Kenneth's knowledge of the risks. The Court therefore denies AbbVie's motion for summary judgment on Juliana's wrongful death claim as it relates to the underlying failure to warn claims.

### 2. Other claims

Aside from the failure to warn claim, AbbVie also argues that (1) Juliana's design defect claims are preempted, (2) Juliana's unjust enrichment claim fails for a variety of reasons, and (3) Missouri law does not recognize redhibition claims and requires pre-suit notice for breach of warranty claims. The Court deals with each point in turn.

### a. Design defect, fraud, negligent misrepresentation, consumer protection

AbbVie contends that Juliana's design defect claims are preempted, relying on *Yates v. Ortho-McNeil-Janssen Pharmaceuticals, Inc.*, 808 F.3d 281 (6th Cir. 2015). and a prior decision by this Court in this MDL. Although the Court analyzed *Yates* in granting summary judgment on the bellwether plaintiffs' negligent design defect claims, in that same decision the Court also expressly denied summary judgment on their strict

liability design defect claims. *See In re Testosterone Replacement Therapy*, 2017 WL 1836435, at *19–20. Juliana does not explain the basis for her negligence claim, and as stated earlier, the Court treats her negligence claim as based solely on AbbVie's alleged failure to warn about the risks of TRT. *See* Section B, *supra*, at 7–8 n.3. The Court therefore concludes that Juliana asserts only a strict liability design defect claim. Because AbbVie has raised no arguments that are applicable to such a claim, it is not entitled to summary judgment on this point.

AbbVie also argues that Juliana's design defect claims are repackaged failure to warn claims. Even if this were true, AbbVie's argument still fails because the Court has denied AbbVie's motion for summary judgment on the failure to warn claims. *See* Section B.1, *supra*. The same is true regarding Juliana's fraud, negligent misrepresentation, and consumer protection claims, which AbbVie addresses only by arguing that they rely on the theory that AbbVie's alleged failure to warn caused Kenneth's injury. Consequently, the Court denies AbbVie's motion for summary judgment on Juliana's wrongful death claim as it relates to the strict liability design defect, fraud, negligent misrepresentation, and consumer protection claims.

### b. Unjust enrichment

"The essential elements of unjust enrichment are: '(1) the defendant was enriched by the receipt of a benefit; (2) that the enrichment was at the expense of the plaintiff; and (3) that it would be unjust to allow the defendant to retain the benefit.'" *Cent. Parking Sys. of Mo., LLC v. Tucker Parking Holdings, LLC*, 519 S.W.3d 485, 498 (Mo. App. Ct. 2017) (quoting *Holliday Inv., Inc. v. Hawthorn Bank*, 476 S.W.3d 291, 295 (Mo. App. Ct. 2015). "The right to restitution for unjust enrichment presupposes, inter

alia, that the enrichment was at the expense of the plaintiff." *Campbell v. Rickert*, 938 S.W.2d 282, 285–86 (Mo. App. Ct. 1997).

Juliana has not provided any evidence for a reasonable jury to believe that any alleged unjust enrichment was at her expense. The plaintiffs sought to recover for Kenneth's past medical bills, pain and suffering experienced by Kenneth, emotional distress experienced by Juliana and Kenneth, loss of consortium, Kenneth's lost income, wrongful death, consumer protection damages, and punitive damages. At no point, however, does the plaintiffs' complaint indicate that Kenneth or Juliana paid for AndroGel out-of-pocket and were seeking to recover those payments, and Juliana did not argue otherwise in her response. As a result, the Court grants AbbVie's motion for summary judgment as it relates to the underlying unjust enrichment claim.

        c.        **Redhibition and breach of warranty**

As AbbVie points out, redhibition is a cause of action under Louisiana law, and plaintiffs point to no legal authority indicating that Missouri recognizes such a claim. For that reason, the Court grants AbbVie's summary judgment motion relating to this claim.

AbbVie also argues that any underlying breach of warranty claim fails because Missouri law requires notice to the seller before the suit. It relies on an earlier summary judgment ruling by the Court in another case in this MDL. Yet the Court's order in that previous case applied Oregon law. *See In re Testosterone Replacement Therapy Prod. Liab. Litig.*, No. 14 C 1748, 2017 WL 1836443, at \*10 (N.D. Ill. May 8, 2017). AbbVie also supports its position with two district court decisions applying Missouri law. It appears from those decisions that no binding authority exists on this point but that "[o]ther district courts . . . have since agreed that the Missouri Supreme Court would . . .

17

require that reasonable notice must be provided pre-suit." *Huskey v. Colgate-Palmolive Co.*, 486 F. Supp. 3d 1339, 1348 (E.D. Mo. 2020). Because Juliana did not address this issue in her response, the Court considers this question forfeited and thus need not address it on the merits. The Court grants AbbVie's motion for summary judgment on Juliana's wrongful death claim as it relates to the underlying breach of warranty claims.

## Conclusion

For the foregoing reasons, the Court denies AbbVie's motion for summary judgment [dkt. no. 47] on Juliana's wrongful death claim as it relates to the underlying strict liability failure to warn, negligent failure to warn, strict liability design defect, fraud, negligent representation, and consumer protection claims. It grants AbbVie's motion for summary judgment on all of the Estate's claims and Juliana's unjust enrichment, redhibition, and breach of warranty claims.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: February 7, 2023